Columbus Motor Car Co. *v.* Textile-Tech, Inc., et al.

(No. M-80-CV-F-35398—Decided July 13, 1981.)

Franklin County Municipal Court.

*Mr. John S. Compton,* for plaintiff.
*Mr. Kenneth A. Gamble,* for defendants.

CRAWFORD, J.   Plaintiff, Columbus Motor Car Com-

pany, (hereinafter referred to as "lessor"), seeks recovery against the defendants, Textile-Tech, Inc., and Ronald L. Brown (hereinafter referred to as "lessees"), for a deficiency balance allegedly owed by lessees to lessor as a result of the early termination of a 24-month open-end lease of a 1979 Cadillac car. Lessees have answered alleging as a defense that lessor failed to comply with the conditions of R. C. Chapter 1309 and is not entitled to a deficiency judgment.

Trial to the court was held on June 4, 1981, after which the court took the case under advisement. The court's findings of fact and conclusions of law are as follows:

## FINDINGS OF FACT:

(1) On April 26, 1979, lessor and lessees entered into a written 24-month open-end lease for a 1979 Cadillac Coupe De Ville.

(2) Lessees' reason for leasing the car resulted from a business arrangement lessees had with a third party, Robert Huey, who was to be the principal user of the car. Huey was not a party to the lease and neither the terms of the business arrangement nor the purpose for the lease were made known to lessor. Delivery of the car was made to Huey by lessor.

(3) The business arrangement between lessees and Huey fell through, and on September 10, 1979, lessee Brown wrote to lessor advising lessor that lessees desired to cancel the lease and requested lessor to assist lessees in repossessing the car from Huey.

(4) Prior to December 28, 1979, lessee Brown and his son obtained possession of the car from Huey. On December 28, 1979, lessees returned the car to lessor, who accepted it, and, pursuant to a writing delivered to lessees, acknowledged that the termination was effective December 28, 1979.

(5) On an invoice dated December 28, 1979, lessor computed the deficiency balance resulting from the premature termination of the lease. The calculation computed by lessor was stipulated by the parties to be accurate and done in compliance with the terms of paragraph No. 31 of the lease. The net amount owed by lessees to lessor as the result of the premature termination is $3,100.60.

(6) The car was "sold" by plaintiff from its leasing division to its used car division at some time subsequent to

December 28, 1979, without notice of the disposition being given to lessees. The used car division subsequently sold the car on the open used car market for $7,300. Lessees were not given notice of the sale by the used car division.

(7) The court presumes from the record that the "sale" by lessor's leasing division to its used car division was an internal paper transaction without any consideration actually flowing to lessor.

(8) At the time of the acceptance by lessor of the termination of the lease on December 28, 1979, lessees were one month behind in their lease payments ($297.23).

## CONCLUSIONS OF LAW:

The questions before this court present significant issues regarding the applicability of R. C. Chapter 1309 (Article 9 of the Uniform Commercial Code—Secured Transactions) to open-end personal property leases.

The specific questions presented are (1) whether the contract between lessor and lessees constitutes a true lease, or whether it was a lease "intended as security" under the provisions of R. C. 1301.01(KK); and (2) if the lease was "intended as security," whether the provisions of R. C. 1309.47(C), requiring a secured party to notify a debtor of the disposition of the collateral, preclude the secured party (lessor) from recovering a deficiency judgment upon failure to notify.

There are numerous cases on this subject throughout the United States but there is a dearth of cases on the subject in Ohio. The only reported Ohio cases that this court has found are federal cases resulting from bankruptcy proceedings; *DeVita Fruit Co.* v. *FCA Leasing Corp.* (C.A. 6, 1973), 473 F. 2d 585; and *In re Walter W. Willis, Inc.* (D.C. N.D. Ohio, E.D. 1970), 313 F. Supp. 1274, affirmed 440 F. 2d 995 (C.A. 6, 1971). A compilation of the numerous non-Ohio cases can be found in 1 UCC Case Digest (1981 Rev.), at Paragraph 1201.37(7).

The court finds that the lease in question is, as a matter of law, "intended as security" pursuant to the provisions of R. C. 1301.01(KK) and that lessor was required to give lessees notice of the disposition of the collateral pursuant to the provisions of R. C. 1309.47(C). The court further finds that lessor failed to give lessees proper notice of the disposition of the col-

lateral and is, therefore, barred from recovering a deficiency judgment. The court, however, also finds that lessees were behind one month's lease payment at the time of the termination of the lease and that the provisions of R. C. 1309.47(C) do not preclude lessor from recovering the lease payment that was owed prior to the termination.

R. C. 1301.01(KK) defines a "security interest" as:

" 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer, section 1302.42 of the Revised Code, is limited in effect to a reservation of a 'security interest.' The term also includes any interest of a buyer of accounts or chattel paper which is subject to sections 1309.01 to 1309.50 of the Revised Code. The special property interest of a buyer of goods on identification of such goods to a contract for sale under section 1302.42 of the Revised Code is not a 'security interest,' but a buyer may also acquire a 'security interest' by complying with sections 1309.01 to 1309.50 of the Revised Code. Unless a lease or consignment is intended as security, reservation of title thereunder is not a 'security interest' but a consignment is in any event subject to the provisions on consignment sales, section 1309.39 [sic] of the Revised Code. *Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.*" (Emphasis added.)

Neither the subjective intent of the parties nor the label that is placed upon the document controls whether the document is a true lease or one intended as a security interest. *In re Samoset Assoc.* (D.C. Maine 1978), 24 UCC Rep. 510.

"* * *The fact that these agreements are denominated as leases is not a controlling factor. * * *

"It is substance and not form which is decisive in determining whether an agreement is intended to create a security interest. * * * Therefore, the court must analyze the contract to determine what rights and obligations have been created.

\*\*\*In other words, the real test is what the contract actually does rather than what it superficially says." *In re Tulsa Port Warehouse Co.* (D.C. N.D. Okla. 1980), 29 UCC Rep. 1608, 1613; See, also, *In re Tillery* (C.A. 5, 1978), 571 F. 2d 1361, 1364.

Some courts have held that the determinative factors in resolving whether a lease is intended as a security interest are whether the lessee has an option to purchase the collateral at the expiration of the lease and, if the lessee has an option to purchase, whether the purchase price is something more than nominal consideration. *Rebhun* v. *Executive Equipment Corp.* (1977), 90 Misc. 2d 576, 394 N.Y. Supp. 2d 792; See, also, Leases as Security Agreements and The Effect of a Failure to Notify on a Security Party's Recovery of a Deficiency Judgment, 23 Utah L. Rev. 567 (1979). A few courts have adopted percentage rules (option price is in excess of a given percent of the purchase price of the collateral at the time of the agreement) to assist them in rendering their decisions. See *In re Alpha Creamery Co., Inc.* (D.C. W.D. Mich. 1967), 4 UCC Rep. 794; *Rebhun, supra,* and the discussion in *FMA Financial Corp.* v. *Pro-Printers* (Utah 1979), 590 P. 2d 803. However, this court agrees with the reasoning of the district court in *In re Tulsa Port Warehouse Co., supra,* in rejecting this approach in cases where there is no option to purchase.

"\*\*\*The problem with applying those tests, however, is that the leases involved in those cases all contained options to purchase. The word option indicates a choice, that is, the lessee can choose whether to purchase the article or to return it to the lessor. In fact, one of the tests adopted by the courts is whether the terms of the lease and option are such that the only sensible course for the lessee at the end of the term is to exercise the option. *Citicorp Leasing, supra.* In other words, where the terms of the agreement will be found to be a lease intended for security.

"In this case, there is no 'option.' The rights and obligations of the parties are unconditional. Therefore, the tests for determining the effect of an option to purchase are inapplicable." *In re Tulsa, supra,* at 1618. The authors of Leases as Security Agreement etc., 23 Utah L. Rev., *op. cit.,* suggest that, with or without an option to purchase, the deciding factor should be whether the option or sale guarantee price is deter-

mined by the fair market value of the collateral at the time of the termination of the agreement (*Id.* at 572). This court does not agree with this view. Rather, it is believed that the lease should be examined in its entirety to determine whether, as a matter of law, it is intended as a security interest.

In reviewing a lease as a whole, the Fifth Circuit Court of Appeals, in *In re Tillery, supra,* at 1366, looked to the following six factors:

"(1) The payments made by the 'Lessee' include an amount specifically denominated as 'Sales Tax'. Only if a sale was involved would a sales tax be incurred.

"(2) The 'Lessee' is required to provide full comprehensive, fire, theft and collision insurance coverages on the vehicle, thereby protecting its full value, not just his 'leasehold' interest therein.

"(3) The 'Lessee' is required to pay all licenses, registration fees, excise taxes, personal property taxes, sales taxes and all other taxes on the vehicle. These obligations normally fall on the buyer or owner of a motor vehicle.

"(4) In the event of loss or destruction of the vehicle, the 'Lessee' is to pay the 'Termination Value' of the vehicle (less the proceeds of any insurance settlement).

"(5) The 'Lessee' is required to indemnify and hold harmless the 'Lessor' from and against any damage, loss, theft or destruction of the vehicle.

"(6) A 'security deposit' of $1,000.00 was required of the 'Lessee'; this being the equivalent of a down payment on the purchase price of the vehicle."

The United States District Court in Oklahoma in *In re Tulsa Port Warehouse, supra,* involving a lease very similar to that which is before this court, found determinative a combination of the following factors:

(1) An open-end lease.

(2) "Lessor is assured by the agreement of the lease that he will receive the original agreed value of the vehicle—no more and no less—plus an amount that is apparently interest." (29 UCC Rep. at 1613.)

(3) In a true lease, the lessor at the end of the lease may do as he pleases with the property. With the lease in question, the lessor must dispose of the property. (29 UCC Rep. at 1614.)

(4) Lessee pays all operating, maintenance, and repair costs. (29 UCC Rep. at 1615.)

(5) Lessee pays all taxes and license fees. (29 UCC Rep. at 1615.)

(6) Lessee must purchase insurance satisfactory to lessor which contains a loss payable to lessor. (29 UCC Rep. at 1615.)

(7) Lessee must indemnify lessor for all losses, damages, injuries, claims, and expenses resulting from the use of the vehicle. (29 UCC Rep. at 1616.)

In the case at bar, the lease does not contain an option to purchase the vehicle at the termination of the lease. As this court has previously stated, this factor does not make the transaction a true lease. See *In re Tillery, supra,* and *In re Tulsa Port Warehouse, supra.*

"Although the agreement does not specifically contain an option to purchase, such an omission is not controlling. Just as the inclusion of an option to purchase does not in and of itself make the lease one intended for security; so also, the exclusion of such an option does not ipso facto make it a 'pure lease.' The determination must be made upon consideration of all the factors involved in the contract." *In re Tillery, supra* (571 F.2d), at 1366. Virtually, every factor found in *In re Tillery, supra,* and *In re Tulsa Port Warehouse, supra,* exists in the case at bar:

(1) An open-end lease.

(2) Lessor is assured the original agreed value of the vehicle plus an amount that is apparently interest (lease paragraph 30[a], 31[a] ).

(3) Lessor must dispose of the vehicle upon termination of the lease (lease paragraph 30[a], 31[a] ).

(4) Lessees pay all insurance costs with coverage limits provided by lessor and, the lessor is an additional insured (lease paragraph 24).

(5) Lessees pay all maintenance and repair expenses (lease paragraph 25).

(6) Lessees pay all license, expenses, fees, taxes and inspection costs (lease paragraph 26).

(7) Lessees pay for indemnification of lessor for all losses, including attorneys' fees for enforcing the lease (lease paragraphs 32, 33).

The court concludes that the lease in question was "in-

tended as security", as defined in R. C. 1301.01(KK), and that lessor had an obligation to notify lessees of the disposition of the collateral as a condition precedent for lessor to recover a deficiency judgment against lessees. See R. C. 1309.02(B) and 1309.47(C).

R. C. 1309.47(C) provides:

"Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor if he has not signed after default a statement renouncing or modifying his right to notification of sale. In the case of consumer goods no other notification need be sent. In other cases, notification shall be sent to any other secured party from whom the secured party has received, before sending his notification to the debtor or before the debtor's renunciation of his rights, written notice of a claim of an interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at a private sale." This court is aware that there is a split of authority nationally with respect to the failure to comply with provisions corresponding to R. C. 1309.47(C). Effect of Creditor Misbehavior on Rights to Deficiency Judgment under the U.C.C., 45 Mo. L. Rev. 162. However, it is believed that the correct statement of the law of Ohio is contained in the headnote to *Liberty Bank* v. *Greiner* (1978), 62 Ohio App. 2d 125, which states:

"Compliance with the notice requirements of R. C. 1309.47(C) is a condition precedent to the recovery of a deficiency judgment and a creditor's failure to comply with such requirements is an absolute bar to the recovery of a deficiency judgment, even though the creditor's disposition of the collateral was otherwise commercially reasonable."

Thus, since lessor is precluded from obtaining a deficiency judgment, this court must determine what amounts sought to be recovered by lessor are the subject of the demand for the deficiency. Since lessor accepted the vehicle on December 28, 1979, and activated the early termination provisions of the lease at that time, the court feels that the deficiency amount runs from the date of the activation of the provision. The lease amount owed prior to that date (November payment, $297.23) should not be considered as part of the deficiency judgment and lessor should have a right to recover that amount.

*Judgment accordingly.*